UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LORILYNN SAAD )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>NANCY A. BERRYHILL, ACTING )<br>COMMISSIONER OF SOCIAL )<br>SECURITY, U.S.A. )<br>    Defendant. ) | CIVIL NO. 3:17-CV-02000 (KAD)<br><br><br><br><br><br><br><br>MARCH 30, 2019 |

**MEMORANDUM OF DECISION RE:**
**THE PLAINTIFF'S MOTION TO REVERSE [ECF NO. 28] AND**
**THE DEFENDANT'S MOTION TO AFFIRM [ECF NO. 34]**

Kari A. Dooley, United States District Judge

The Plaintiff, Lorilynn Saad, ("Saad") brings this administrative appeal pursuant to 42 U.S.C. § 405(g). She appeals the decision of defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, (the "Commissioner") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act (the "Act"). Saad moves to reverse the Commissioner's decision based on (1) perceived defects in the Administrative Law Judge's ("ALJ") analysis at Step 5 of the sequential evaluation process for assessing disability claims, (2) the ALJ's purported failure to develop the administrative record, and (3) the weight the ALJ afforded the opinions of three psychologists in his decision  The Commissioner opposes each of these claims of error and moves for an order affirming its decision. For the reasons set forth below, Saad's Motion to Reverse is DENIED and the Commissioner's Motion to Affirm is GRANTED.

**Standard of Review**

It is well-settled that a district court will reverse the decision of the Commissioner only when it is based upon legal error or when it is not supported by substantial evidence in the record. *See Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997); *see also* 42 U.S.C. § 405(g) ("The

findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012) (internal quotations omitted). The court does not inquire as to whether the record might also support the plaintiff's claims but only whether there is substantial evidence to support the Commissioner's decision. *Bonet ex rel. T.B. v. Colvin,* 523 Fed. Appx. 58, 59 (2d Cir. 2013). Substantial evidence can support the Commissioner's findings even if there is the potential for drawing more than one conclusion from the record. *See Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017). The court can reject the Commissioner's findings of facts "only if a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin.* 683 F.3d 443, 448 (2d Cir. 2012). Stated simply, "if there is substantial evidence to support the [Commissioner's] determination, it must be upheld." *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013).

**Factual and Procedural History**

On March 4, 2013, Saad filed an application for disability insurance benefits pursuant to Title II of the Act, alleging an onset date of January 8, 2012. The claim was denied initially on June 27, 2013 and upon reconsideration on August 30, 2013. Thereafter, a hearing was held before an ALJ on March 24, 2015. On July 23, 2015, the ALJ issued a written decision denying Saad's application.

In his decision, the ALJ followed the sequential evaluation process for assessing disability claims.[1] At Step 1, the ALJ found that Saad had not been engaged in substantial gainful activity

---

[1] Pursuant to regulations promulgated by the Commissioner, a five-step sequential evaluation process is used to determine whether a claimant's condition meets the Act's definition of disability. *See* 20 C.F.R. § 404.1520. In brief, the five steps are as follows: (1) the Commissioner determines whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner determines

2

since the claimed onset date. At Step 2, the ALJ determined that Saad had a severe combination of impairments, which included generalized anxiety disorder, depressive disorder, alcohol dependence disorder, recurring left wrist ganglion, and right knee patella bursitis. At Step 3, the ALJ concluded that Saad's impairments, including her substance abuse, met or medically equaled the severity of one of the listed impairments in Appendix 1. At Step 3, the ALJ was also required to determine the severity of Saad's impairments without consideration of the substance abuse disorder.[2] The ALJ concluded that if Saad ended her substance abuse she would continue to have a severe combination of impairments, but any such impairments would not meet or equal the severity of one of the listed impairments in Appendix 1. At Step 4, the ALJ concluded that Saad would have a residual functional capacity ("RFC") to perform light work, subject to certain exceptions and limitations, if she stopped her substance abuse. The ALJ further found that Saad did not have the RFC to perform her past relevant work as a manicurist, even if she ceased her substance abuse. Finally, at Step 5, the ALJ concluded that there would be a significant number of jobs in the national economy that Saad could perform if she stopped her substance abuse.

---

whether the claimant has a "severe impairment" which limits her mental or physical ability to do basic work activities; (3) if such a "severe impairment" is established, the Commissioner next determines whether the medical evidence establishes that the claimant's impairment "meets or equals" an impairment listed in Appendix 1 of the regulations; (4) if the claimant does not establish the "meets or equals" requirement, the Commissioner must then determine the claimant's residual functional capacity to perform her past work; (5) if the claimant is unable to perform her past work, the Commissioner must next determine whether there is other work in the national economy which the claimant can perform. 20 C.F.R. 404.1520(a)(4)(i)-(v). The claimant bears the burden of proof with respect to Step 1 through Step 4, while the Commissioner bears the burden of proof as to Step 5. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008); *McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir. 2014).

[2] If an ALJ has "evidence of [a claimant's] drug addiction or alcoholism," it "must determine whether [the claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535. If the addiction is a such a contributing factor material to the determination that he or she is disabled, the claimant is not disabled. *E.g.*, *Smith v. Comm'r of Soc. Sec. Admin.*, 731 Fed. Appx. 28, 30 (2d Cir. 2018) (summary order) (holding ALJ did not err in conclusion that claimant was not disabled where her substance use was a contributing factor material to the determination that she was disabled).

3

Accordingly, the ALJ found that Saad was not disabled within the meaning of the Act. This appeal followed.

**Discussion**

*The ALJ's Analysis at Step 5*

Saad raises two general challenges to the ALJ's analysis at Step 5. First, Saad argues that the ALJ's hypothetical to the vocational expert did not account for several of her limitations and, therefore, was patently defective. Second, Saad argues that the vocational expert's testimony concerning the number of jobs available in the national economy was inaccurate and, therefore, the ALJ erred by relying on his testimony.

**The ALJ's Hypothetical to the Vocational Expert**

Saad argues that the ALJ's hypothetical to the vocational expert was defective in three respects. First, Saad argues that the hypothetical did not account for her recurring left wrist ganglion or her right knee patella bursitis. Second, Saad argues that the hypothetical failed to address the extent to which off-task behavior or absences would be permitted by an employer. Third, and finally, Saad contends that the ALJ's hypothetical to the vocational expert, which assumed that she could perform "simple, routine, repetitious tasks," was defective because the ALJ found that she has "moderate difficulties" in concentration, persistence, and pace. The Commissioner responds that the ALJ's hypothetical adequately accounted for each of the limitations included in Saad's RFC, which Saad has not challenged, and was therefore not defective. The Court agrees with the Commissioner.

At Step 2, the ALJ found that Saad had recurring ganglion cysts on her left wrist. After a surgery in March 2013, however, Saad's condition improved. The ALJ acknowledged that Saad

4

re-injured her wrist in a fall in June 2013[3] but noted that she received no significant treatment for her wrist after that accident and had only "infrequent" complaints regarding her wrist after that accident. After June 2013, there was a gap in Saad's orthopedic records until July 2014, when Saad injured her knee in another slip-and-fall incident. The ALJ noted that, although Saad reported continuing pain, her "medical imaging and clinical signs were unimpressive and did not reflect disabling limitations." Moreover, by September 2014, Saad was complaining of "only intermittent pain," "on examination her right knee was stable with full range of motion," and she "reported no mechanical issues." Saad does not challenge any of these findings, which are all consistent with the ALJ's conclusion that Saad is capable of performing light work. The regulations define light work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). Consequently, although the ALJ did not expressly include Saad's wrist and knee impairments in his hypothetical to the vocational expert, the hypothetical did include the restriction to light work and therefore adequately accounted for those impairments.[4]

Next, Saad faults the ALJ for not addressing permissible off-task behavior or absences in his hypothetical to the vocational expert. As the Commissioner correctly observes, however, the ALJ did not make any finding that Saad would be off-task or absent to a significant extent, and

---

[3] The ALJ found in his decision that Saad reinjured her wrist in a slip-and-fall in June 2014. This appears to be a typographical error. The medical records he cites to reflect that this injury occurred in June 2013, not June 2014. In addition, later in his decision, the ALJ correctly notes that the large gap in Saad's orthopedic records was from June 201**3** to July 2014.

[4] Saad repeatedly contends that the ALJ concluded that her wrist and knee impairments were "severe" at Step 2 and, therefore, the ALJ should have included greater restrictions on her RFC in his hypothetical. The ALJ made no such finding however. At Step 2, the ALJ found only that Saad had a "severe combination of impairments" and that combination included Saad's wrist and knee impairments. As previously noted, Saad has not challenged this conclusion or the ALJ's findings with respect to her RFC.

5

Saad has not challenged the omission of this limitation from her RFC. As such, there was no need to include this inquiry as part of the hypothetical.

Finally, Saad contends that the ALJ's hypothetical failed to account for her moderate difficulties in concentration, persistence, and pace. However, Saad's RFC did not include a finding of moderate difficulties in concentration, persistence, and pace. Rather, this finding was made at Step 2, when determining whether, based on the Paragraph B criteria, Saad had a mental impairment that met or medically equaled the criteria of the Listings when not abusing alcohol.

> The limitations identified in the "paragraph B . . . criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. It follows that the ALJ is not required to explicitly include the 'paragraph B' limitations in his RFC assessment."

*Brown v. Colvin*, No. 3:14-cv-01784 (WIG), 2016 WL 2944151, at *4 n.2 (D. Conn. May 20, 2016) (quoting *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96–8P (S.S.A. July 2, 1996)).

In any event, the ALJ did account for Saad's difficulties in concentration, persistence, and pace in the RFC by limiting her to "routine, repetitive tasks." The ALJ's hypothetical to the vocational expert further accounted for this limitation by positing that the claimant had "occasional difficulties with concentration on detailed or complex tasks" and was "limited to simple, routine, repetitious tasks." Accordingly, Saad's third challenge to the ALJ's hypothetical to the vocational expert fails as well.

### The ALJ's Reliance on the Vocational Expert's Statistical Analysis

Saad next challenges the ALJ's reliance on the testimony of the vocational expert regarding the number of relevant jobs available in the national economy. Saad argues that the statistics provided by the vocational expert do not align with the statistics reported by the Bureau of Labor Statistics ("BOLS") and, therefore, the ALJ erred by relying on this testimony. In advancing this

argument, Saad cites to BOLS statistics which were not presented to the ALJ, were not raised during the cross-examination of the vocational expert, and which appear nowhere in the record. "We consider evidence outside the record before us only under 'extraordinary circumstances.'" *Ling Chen v. Comm'r of Soc. Sec. Admin.*, 741 Fed. Appx. 849, 851 (2d Cir. 2018) (summary order) (quoting *Int'l Bus. Machs. Corp. v. Edelstein*, 526 F.2d 37, 45 (2d Cir. 1975)). Saad has not advanced any argument that extraordinary circumstances are present here sufficient to justify supplementing the record with this new evidence.

Even if this new evidence were considered, however, Saad's argument fails. "At Step Five, the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform. An ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citation omitted). With respect to the testimony of vocational experts, district courts in the Second Circuit "follow the 'Seventh Circuit's approach of requiring some evidentiary basis to rely up[on] the opinions of the vocational expert.'" *Koutrakos v. Colvin*, No. 3:13-cv-01290 (JGM), 2015 WL 1190100, at *20 (D. Conn. Mar. 16, 2015) (alternations omitted) (quoting *Wages v. Comm'r of Soc. Sec.*, No. 3:11-cv-01571 (JHC), 2013 WL 3243116, at *6 (D. Conn. June 26, 2013)). An ALJ does not err when he relies on a vocational expert's testimony that is based on personal experience, labor market surveys, and published statistical sources in determining the number of jobs available. *E.g.*, *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 407 (D. Conn. 2012), *aff'd*, 515 Fed. Appx. 32 (2d Cir. 2013) (summary order). It is also enough for the vocational expert to identify "'the sources he generally consulted to determine'" the availability of jobs, even if he does not provide "specific information." *Brault*, 683 F.3d at 450 (citing *Galiotti v. Astrue*, 266 Fed. Appx. 66 (2d Cir. 2008) (summary order)); *see*

7

*also McIntyre*, 758 F.3d at 152 ("[A] vocational expert is not required to identify with specificity the figures or sources supporting his conclusion, at least where he identified the sources generally.").

The occupation evidence provided by a vocational expert, however, "should be consistent with the occupational information supplied by the [Dictionary of Occupational Titles]. . . . [A]s part of the [ALJ]'s duty to fully develop the record, the [ALJ] will inquire, on the record, as to whether or not there is such consistency." *Soc. Sec. Ruling 00-4p*, 2000 WL 1898704 (Dec. 4, 2000). ALJs "rely primarily" on the Dictionary of Occupational Titles ("DOT") in making disability determinations. *Id.*; *see* 20 C.F.R. § 404.1566(d)(1) (taking notice of DOT as a reliable source of job information). The DOT is a publication by Department of Labor that "gives a job type a specific code . . . and establishes, among other things, the minimum skill level and physical exertion capacity required to perform that job." *Brault*, 683 F.3d at 446. The DOT provides information to the vocational expert and ALJ that is useful in determining "the type of work a disability applicant can perform." *Id.* "The DOT, however, just *defines* jobs. It does not report how many such jobs are available in the economy." *Id.* (emphasis in original). In order to provide information regarding the availability of the jobs listed in the DOT, the vocational expert must turn to other sources, such as the Occupational Employment Quarterly published by the BOLS. *See, e.g., id.*

Here, the vocational expert testified regarding the type of jobs that Saad was capable of holding, given her physical and mental limitations, as posed by the ALJ in hypothetical questions. The vocational expert further testified as to the number of available jobs, both locally and nationally, for each position. He confirmed that his testimony was "consistent with" the DOT. On cross-examination, Saad's counsel asked for the source of the vocational expert's statistical data,

and the vocational expert testified that one of the sources he often relies on is the BOLS. The vocational expert further explained that because the BOLS does not address physical or mental limitations, he uses the BOLS data in conjunction with DOT data, which does discuss the physical exertion and skill level associated with a particular job.

Here, as noted, Saad claims that the figures reported by the vocational expert do not align with the statistics reported by the BOLS in 2014. Specifically, Saad notes that the vocational expert testified that there are approximately 900,000 persons employed as an "assembler" under the DOT, but the BOLS reports only 217,500 occupations for the "All Other Production Workers" classification. Whether or not this is accurate, it is not helpful to Saad's claim. The vocational expert did not testify that he relied on the BOLS numbers alone for his testimony, let alone the numbers related to the "All Other Production Workers" classification. He merely testified that the BOLS was one of the sources he ordinary relied upon in his analysis. As a result, he could have been relying on reported data for one or a combination of job classifications that would correspond to the applicable DOT job descriptions. Similarly, the vocational expert could have been relying upon data reported by another source. In any event, it is impossible to know because the issue was not raised when the case was before the Commissioner. For these reasons, the Court cannot find that the ALJ erred when it relied on the testimony of the vocational expert concerning the number of jobs available in the national economy for the job of "assembler."

For each of the foregoing reasons, the Court concludes that the ALJ's findings at Step 5 are supported by substantial evidence in the record.

### *The ALJ's Development of the Administrative Record*

Saad next argues that the ALJ failed to develop an adequate record concerning her physical impairments. "[T]he ALJ, unlike a judge in a trial, must . . . affirmatively develop the record in

light of the essentially non-adversarial nature of a benefits proceeding, even if the claimant is represented by counsel." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (citation omitted; internal quotation marks omitted). "Nevertheless, the Second Circuit has held that it is not *per se* error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician." *Sanchez v. Colvin*, No. 13-cv-06303 (PAE), 2015 WL 736102, at *5 (S.D.N.Y. 2015). Instead, the Second Circuit has stated that medical reports submitted on behalf of the claimant "'*should* include . . . [a] statement about what [the claimant] can still do despite [the claimant's] impairment,' not that they *must* include such statements . . . [and] 'the lack of the medical source statement will not make the report incomplete.'" *Tankisi v. Comm'r of Social Sec.*, 521 Fed. Appx. 29, 33 (2d Cir. 2013) (summary order) (emphasis in original) (citing 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6)). "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information." *Pellam v. Astrue*, 508 Fed. Appx. 87, 90 (2d Cir. 2013) (summary order) (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)).

In this case, the ALJ was not required to obtain a medical source opinion from Saad's treating orthopedist. Saad's orthopedist repeatedly opined concerning Saad's presentation and her functional capacity with respect to her wrist and knee impairments in the treatment notes. For example, in February 2013, Saad's orthopedist opined, with respect to her wrist impairment, that Saad could return to "light work" as of February 23, 2013, subject to certain limitations. Similarly, in July 2014, shortly after her knee injury, Saad's orthopedist noted that she was able to extend her leg fully and that she was approved for "[l]ight range of motion and light activities." Remand is not necessary if, as here, the record contains sufficient evidence from which an ALJ can assess the claimant's residual functional capacity. *Tankisi*, 521 Fed. Appx. at 34.

*The ALJ's Application of the Treating Physician Rule*

Saad's final claim on appeal is that the ALJ erred in his ascription of weight to three consulting and/or treating psychologists. First, Saad contends the ALJ erred by affording any weight to the opinions of state's two consulting psychologists. Second, and relatedly, Saad contends that the ALJ failed to meaningfully explain why he afforded "substantial weight" to the consulting psychologists' opinions at Step 3 but "little weight" to their opinions at Step 4. Lastly, Saad contends that the ALJ violated the treating physician rule by not affording controlling weight to the opinion of Saad's treating psychologist, Dr. Mihaela Nedelcuta. The Court rejects these arguments.

Although "ALJs should not rely heavily on the findings of consultative physicians after a single examination"; *Selian*, 708 F.3d at 419; and ordinarily, "a consulting physician's opinions or reports should be given limited weight"; *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990); "the report of a consultative physician may constitute [substantial] evidence"; *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *see also Prince v. Astrue*, 490 Fed. Appx. 399, 401 (2d Cir. 2013) ("consultative examinations were still rightly weighed as medical evidence"); *Petrie v. Astrue*, 412 Fed. Appx. 401, 405 (2d Cir. 2011) (summary order) ("the report of a consultative physician may constitute . . . substantial evidence").

With respect to the weight afforded to the consulting psychologists' opinions at Steps 3 and 4, the ALJ adequately explained his weight ascriptions. At Step 3, the ALJ afforded "substantial weight" to the consulting psychologists' Psychiatric Review Technique ("PRT") assessment, and expressly stated that he was doing so because the consulting psychologists were mental health specialists, were experts in social security disability evaluations, were familiar with the rules and regulations governing PRT assessments, and their PRT assessments were supported

by specific medical evidence in the record. At Step 4, the ALJ afforded only "little weight" to the mental residual functional capacity assessment ("MRFC) completed by these same consultants, explaining that the consulting psychologists' opinions with respect to MRFC were less persuasive because they did not treat or examine Saad and they did not examine more recent evidence submitted at the hearing level. Accordingly, Saad's argument that the ALJ failed to explain his weight ascriptions with respect to the consulting psychologists in a meaningful manner is not supported by the record.

Saad next argues that the ALJ failed to follow the treating physician rule with respect to Dr. Nedelcuta's opinion. "The treating physician rule provides that an ALJ should defer 'to the views of the physician who has engaged in the primary treatment of the claimant,'" but need only assign those opinions "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the claimant's] case record." *Cichocki v. Astrue*, 534 Fed. Appx. 71, 74 (2d Cir. 2013) (alteration in original) (summary order) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. § 404.1527(c)(2)). When the ALJ does not give the treating source's opinion controlling weight, he must "apply the factors listed" in SSA regulations, 20 C.F.R. § 404.1527(c)(2), including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418. After considering these factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion"; *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); and provide "good reasons" for the weight assigned. *Burgess v. Astrue*, 537 F.3d 117, 129–30 (2d Cir. 2008).

Here, the ALJ afforded "little weight" to the MFRC form completed by Dr. Nedelcuta. Saad argues that the ALJ's conclusions with respect to this form are erroneous, in part, because he mistakenly concluded that the form was completed on February 26, 2013, rather than September 26, 2013. This is significant, Saad contends, because the ALJ afforded little weight to the MRFC form because it was inconsistent with Dr. Nedelcuta's clinical notes from February 2013. Dr. Nedelcuta's handwriting is not a model of clarity, and the MRFC form appears to be dated February 26, 2013. Yet, based on the three fax tags on the MRFC form and some of Dr. Nedelcuta's handwriting elsewhere in the record, the MRFC form might well have been completed in September 2013. Whether the MRFC form was completed in February 2013 or September 2013 is ultimately immaterial to the issues on appeal, however, because the ALJ provided good reasons for affording little weight to the MRFC form.

The ALJ explained that he afforded little weight to the MRFC form because it was an "attorney-supplied, checklist-style form," it described "far more severe limitations than those described by Dr. Nedeculta in her August, 2013 assessment," "provided no rationale based on specific evidence to justify the severe limitations she described" in the form, and "describes debilitating limitations not supported by the evidence of record or other opinions." These reasons are supported by the record and provided an adequate basis for the weight ascribed to the MRFC form. First, "[c]heck box forms are 'weak evidence at best[,]' and are 'only marginally useful for purposes of creating a meaningful and reviewable factual record.'" *Galarza v. Berryhill*, No. 3:18-cv-00126 (SALM), 2019 WL 525291, at \*9 (D. Conn. Feb. 11, 2019); *see also Halloran*, 362 F.3d at 31 n.2 ("The standardized form . . . is only marginally useful for purposes of creating a meaningful and reviewable factual record."). Second, Dr. Nedeculta's responses on the MRFC form are inconsistent with her August 2013 assessment as well as other evidence in the record

concerning Saad's mental RFC when not abusing alcohol, a fact that the Plaintiff does not appear to dispute.[5] Third, Dr. Nedelcuta did not provided any rationale for the limitations she attributed to Saad in the MRFC form. Finally, it should be noted that the record reveals that Saad had resumed using alcohol in approximately June 2013. Accordingly, if the MRFC form was completed in September 2013 (after Saad resumed her use of alcohol), it is of less probative value than if it were completed during a period of sobriety, as the ALJ was required to determine Saad's MRFC when she was not abusing alcohol.

In sum, the Court concludes that the ALJ's determination as to the weight afforded each of the psychologists is supported by substantial evidence in the record and, therefore, Saad's third claim of error fails as well.

**Conclusion**

For all the foregoing reasons, Saad's Motion to Reverse [ECF No. 28] is DENIED and the Commissioner's Motion to Affirm [ECF No. 34] is GRANTED.

**SO ORDERED** at Bridgeport, Connecticut, this 29thday of March 2019.

                                                  */s/ Kari A. Dooley*
                                                 KARI A. DOOLEY
                                                 UNITED STATES DISTRICT JUDGE

---

[5] Notably, if the MRFC form was in fact completed in September 2013, one month after the August 2013 assessment, then the disparity between the two forms is even more problematic for Saad, particularly because Dr. Nedelcuta did not provide any explanation for this change of opinion.

14